United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIERRA FOREST LEGACY, CENTER FOR BIOLOGICAL DIVERSITY, SIERRA CLUB, and DEFENDERS OF WILDLIFE, | No. C-08-4240 SC |
| Plaintiffs, | ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| UNITED STATES FOREST SERVICE; ABIGAIL KIMBALL, in her official capacity as Chief of the Forest Service; CHARLES MYERS, in his official capacity as Associate Deputy Chief of the Forest Service; RANDY MOORE, in his official capacity as Regional Forester, Region 5, U.S. Forest Service; BETH PENDLETON, in her official capacity) as Deputy Regional Forester, Region 5, U.S. Forest Service, | |
| Defendants. | |

I.    **INTRODUCTION**

This litigation arises out of an amendment to the land and resource management plans for the Sierra Nevada national forests, adopted by the United States Forest Service ("Forest Service"). See Compl., Docket No. 1. Plaintiffs Sierra Forest Legacy, Center for Biological Diversity, Sierra Club, and Defenders of Wildlife (collectively "Plaintiffs") have filed a Motion for Summary Judgment and Memorandum in Support of their Motion. Docket Nos. 31, 32 ("Pls.' MSJ"). Defendants, including the Forest Service, filed their own Motion for Summary Judgment and Memorandum in

1  Support of Motion for Summary Judgment and in Opposition to

2  Plaintiffs' Motion for Summary Judgment.  Docket Nos. 33, 34

3  ("Defs.' MSJ").  Each side submitted a Reply.  Docket Nos. 37

4  ("Pls.' Reply"), 40 ("Defs.' Reply").[1]

5      Having reviewed the parties' submissions, the Court GRANTS

6  Defendants' Motion for Summary Judgment and DENIES Plaintiffs'

7  Motion for Summary Judgment.

8

9  **II.   STATUTORY FRAMEWORK**

10     The Forest Service, an agency within the United States

11  Department of Agriculture, is responsible for the management of

12  National Forests and grasslands.  The Forest Service promulgates

13  regulations in a three-tier system, pursuant to the Forest and

14  Rangeland Renewable Resources Planning Act of 1974 and the

15  National Forest Management Act ("NFMA").  See Citizens for Better

16  Forestry v. United States Dep't of Agric., 341 F.3d 961, 965 (9th

17  Cir. 2003) ("Citizens I") (citing 16 U.S.C. §§ 1601-1687).  At the

18  highest level, the Secretary of Agriculture promulgates national

19  regulations, which govern the development of the regional and

20  local forest management plans and require compliance with the

21  National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et

22  seq.  Id. (citing 16 U.S.C. § 1604(g)).  The second tier comprises

23  "land and resource management plans" ("LRMPs" or "forest plans"),

24  governing the management of forest regions.  Id. at 966.  Finally,

25

26     [1] Plaintiffs submitted both a Reply and a Corrected Reply.
    Docket Nos. 35, 37.  In this Order, all references are to
27  Plaintiffs' Corrected Reply.

28                                2

there are "site-specific" plans, designed to implement specific, on-the-ground actions that are consistent with the national regulations and the LRMPs.  Id.  The determination at issue in this suit, described in Part III, infra, relates to the second tier and affects the LRMPs.

Prior to taking any "major Federal action[] significantly affecting the quality of the human environment," a federal agency must prepare an Environmental Assessment ("EA").  42 U.S.C. § 4332(2)(C); see also 40 C.F.R. §§ 1501.4(a), 1508.9; West v. Sec'y of the Dep't of Transp., 206 F.3d 920, 927 (9th Cir. 2000). If the agency concludes that "substantial questions are raised as to whether the project may cause significant degradation of some human environmental factor," then the agency must prepare an Environmental Impact Statement ("EIS").  West, 206 F.3d at 927 (citation omitted).  Alternatively, the agency may simply opt to prepare an EIS, thereby eliminating the need for an EA.  40 C.F.R. § 1501.3.

In addition to these requirements under NEPA, federal agencies must comply with the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq.  Prior to any agency action, including the promulgation of new regulations, the agency must determine whether the proposed action "may affect" any endangered or threatened species, or adversely affects the critical habitats of such species.  50 C.F.R. § 402.14(a).  If the agency so finds, then the agency must consult with either the Fish & Wildlife Service ("FWS") or the National Marine Fisheries Service ("NMFS") (collectively, "Wildlife Services").  See 16 U.S.C. § 1536(a)(2)-

United States District Court
For the Northern District of California

(4); 50 C.F.R. § 402.14; <u>Forest Guardians v. Johanns</u>, 450 F.3d 455, 457 (9th Cir. 2006).[2]  If the Wildlife Services advise the agency that endangered or threatened species may be present at the site of the proposed action, the agency must prepare a "Biological Assessment" ("BA") describing those species and the possible effects on them.  <u>Id.</u> § 1536(c); <u>see also</u> <u>Citizens I</u>, 341 F.3d at 967 n.3.  The BA may be conducted as part of the agency's NEPA-compliant EIS or EA.  16 U.S.C. § 1536(c); <u>see also</u> 50 C.F.R. § 402.12.  If the agency consults with the Secretary informally and concludes that no threatened or endangered species or habitat will be affected, it need not engage in formal consultation.  50 C.F.R. § 402.14(b).

### III.  FACTUAL BACKGROUND

There are ten National Forests in the Sierra Nevada mountain range.  AR at 6181.[3]  These forests are managed by the Forest Service pursuant to the NFMA, 16 U.S.C. § 1601 <u>et</u> <u>seq.</u>  The NFMA requires that the Forest Service adopt a plan for each national forest unit in order to, among other things, "provide for diversity of plant and animal communities . . . ."  16 U.S.C. § 1604(g)(3)(B).  The Forest Service has adopted forest plans for each of the forests in the Sierra Nevada.  AR at 1-508.  Pursuant

---

[2] The agency must consult with the Secretary of Commerce (over the NMFS) if the proposed action will affect marine species, or the Secretary of Interior (over the FWS) if the action will affect non-marine species.  <u>See</u> <u>Citizens I</u>, 341 F.3d at 967 n.3; <u>see also</u> 16 U.S.C. § 1532(15).

[3] Citation to the Administrative Record will be in the format "AR at [page number]."

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    to the 1982 implementing regulation to the NFMA, the plan for each

2    forest establishes monitoring and evaluation requirements to

3    provide a basis for periodically evaluating the effects of the

4    Forest Service's management practices.  <u>See</u> 1982 Regs.

5    § 219.12(k).[4]  To this end, the Forest Service has tracked the

6    population and habitat of "management indicator species" ("MIS"),

7    which serve as "bellwether" species, and whose population

8    fluctuations were believed to indicate the effects of various

9    forest management activities on particular habitats.  <u>See</u> AR at

10   6186.

11       Prior to the amendment that is the subject of this

12   litigation, discussed in detail below, the Forest Service

13   monitored a total of sixty MIS in the Sierra Nevada.  <u>See</u> AR at

14   6211-12, 6214-15.  Each MIS was selected by individual National

15   Forests according to criteria that were set at the regional level.

16   <u>Id.</u> at 6211-12.  For each MIS, individual National Forests adopted

17   detailed monitoring protocols, management objectives, and specific

18   thresholds that would trigger the reconsideration of management

19   actions or the adoption of mitigation measures.  <u>Id.</u>  For example,

20

21       [4] This Order will use "1982 Regs." to refer to the 1982
     Planning Rule, 36 C.F.R. § 219.1 <u>et</u> <u>seq.</u> (superseded November 9,
22   2000).  These regulations have been superseded several times, most
     recently in 2008.  73 F.R. 21468, 21505 (Apr. 21, 2008).  However,
23   for various reasons, several of the earlier amendments were not
     implemented.  <u>See</u> <u>Citizens for Better Forestry v. United States</u>
24   <u>Dep't of Agric.</u>, 481 F. Supp. 2d 1059, 1064-66 (N.D. Cal. 2007)
     ("<u>Citizens II</u>") (discussing history of various amendments to
25   framework of 1982 Regulations).  All parties concur that the 1982
     Regulations were in effect when the challenged administrative
26   determination took place, and according to the Administrative
     Record, the determination was made in accordance with the 1982
27   Regulations.  <u>See</u> Pls.' MSJ at 4 n.3; Defs.' MSJ at 24; AR at 6187.

28

United States District Court
For the Northern District of California

under the Eldorado National Forest Land and Resource Management Plan, "further action" would be triggered if monitoring revealed a twenty-five percent change in black bear populations over a five-year period.  Id. at 74-75.

According to the Forest Service, the MIS monitoring system encountered numerous problems in practice.  See id. at 6188.  The fact that each National Forest used different lists made it difficult to standardize or coordinate monitoring efforts.  Id. at 6190.  Most MIS were selected before 1992, and over the following years the Forest Service discovered that many of these species were difficult or expensive to monitor, or were not strongly linked to habitats that were affected by the Forest Service's management activities.  Id.  The Forest Service also encountered "unexpected MIS monitoring and analysis obligations stated in recent judicial decisions."  Id. at 6189.  The Forest Service faced "dozens" of adverse judicial decisions, most notably Earth Island Inst. v. United States, 442 F.3d 1147 (9th Cir. 2006) ("Earth Island"), in which courts interpreted the Forest Service's regulatory regime to require "extensive MIS population monitoring data and analysis prior to the issuance of project decisions implementing" Forest Service projects.  AR at 6189.  These cases enjoined various projects after concluding that the Forest Service had failed to perform adequate MIS monitoring and analysis.  See, e.g., Earth Island, 442 F.3d 1147 (reversing denial of preliminary injunction of fire restoration project); Sierra Nevada Forest Prot. Campaign v. Tippin, No. 06-351, 2006 WL 2583036 (E.D. Cal. Sept. 6, 2006) (enjoining logging project); Sierra Club v.

United States District Court
For the Northern District of California

1    Eubanks, 335 F. Supp. 2d 1070 (E.D. Cal. 2004) (same).

2         In December of 2007, the Forest Service, through the

3    authority of the Regional Forester, adopted an amendment to the

4    MIS monitoring scheme for the forests in the Sierra Nevada (the

5    "MIS Amendment").  Id. at 6160-77.  The MIS Amendment reduced the

6    number of terrestrial habitats that are monitored, and cut the

7    total number of MIS to twelve (in addition to aquatic

8    macroinvertebrates to represent rivers, lakes, and streams).  Id.

9    at 6161-62.  Certain habitats (such as caves and cliffs) were not

10   represented by any MIS, because the Forest Service concluded that

11   these habitats were "not affected by, or only minimally affected

12   by, management actions currently of concern . . . ."  Id. at 6236.

13   The MIS amendment did not set new habitat objectives, and did not

14   set new population thresholds and objectives, as had previously

15   existed in individual forest plans, because it determined that

16   they were not required and could be prepared at a later date.  See

17   id. at 6423, 6429.  Finally, the MIS Amendment stated:

18           Complete fulfillment of the plan-level monitoring
             program outlined in this decision and through the
19           forthcoming monitoring implementation package is
             not a precondition to project approval and
20           implementation. . . .  Therefore, if the Forest
             Service . . . is unable to fully achieve the
21           monitoring goals set forth in this amendment for a
             particular MIS, a project affecting habitat for
22           that MIS may nonetheless proceed.

23   Id. at 6175; see also Sierra Nev. Forest Prot. Campaign v. Rey,

24   573 F. Supp. 2d 1316, 1335-36 (E.D. Cal. 2008) (finding question

25   of monitoring compliance to be mooted by MIS Amendment).

26        Prior to adopting the MIS Amendment, the Regional Forester

27   prepared both a Draft and a Final Environmental Impact Statement

28                                  7

United States District Court
For the Northern District of California

("DEIS" and "FEIS"). <u>Id.</u> at 6010-159, 6178-594. The FEIS concluded that the MIS Amendment would have "no ecological effects. This is because the [MIS amendment] solely involve[s] a procedure whereby particular species are monitored, and data are gleaned and analyzed based on the monitoring results." <u>Id.</u> at 6231. The Regional Forester also prepared a BA of the impact of the MIS Amendment on species protected under the ESA. <u>Id.</u> at 6072, 6267-68. The BA concluded that the MIS Amendment would have "no effect" on threatened or endangered species, or on the critical habitat of such species. <u>Id.</u> The Wildlife Services later concurred informally that the MIS Amendment would have no effect on ESA-listed species. <u>Id.</u> at 4942-43, 7940-41. Based on its own conclusions and the concurrences of the Wildlife Services, the Forest Service implemented the MIS Amendment without engaging in formal consultation. <u>Id.</u> at 6267-68.

On December 14, 2007, the Deputy Regional Forester of the Pacific Southwest Region of the Forest Service signed the record of decision approving the MIS Amendment. <u>Id.</u> at 6177. Plaintiffs appealed that decision, but their appeal was denied by the Associate Deputy Chief of the Forest Service. <u>See id.</u> at 12258-75. Shortly after their administrative appeal was denied, Plaintiffs filed this suit, alleging violations of the ESA, NEPA, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 <u>et seq.</u>

No party challenges the legal authority of the Forest Service to alter the MIS monitoring scheme or to pass the MIS Amendment. This is a procedural challenge, based on Plaintiffs' allegations

8

that Defendants have failed to comply with the requirements of NEPA and the ESA.  In particular, Plaintiffs allege that the FEIS (1) does not adequately describe the "no action" alternative; (2) does not adequately describe the plan of action adopted by the Forest Service; and (3) arbitrarily and capriciously concluded that the MIS Amendment had "no ecological effects," and failed to describe its impacts.  Pls.' MSJ at 13-31.  Plaintiffs also claim that (4) Defendants failed to formally consult with the FWS and the NMFS in accordance with the requirements of the ESA.  Id. at 32-38.

**IV.   LEGAL STANDARD**

    **A.   Motions for Summary Judgment**

    Summary judgment under Rule 56(c) of the Federal Rules of Civil Procedure may be granted where the pleadings and materials on file show "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Material facts are those that might affect the outcome of the case, and a dispute is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986).  Where a case involves review of a final agency determination under the APA, 5 U.S.C. § 706, resolution generally "does not require fact finding on behalf of [a] court."  Northwest Motorcycle Ass'n v. United States Dep't of Agric., 18 F.3d 1468, 1471-72 (9th Cir. 1994); see also Wilderness Soc'y v. Bosworth, 118 F. Supp. 2d 1082, 1089 (D. Mont. 2000) ("Summary judgment is a

United States District Court
For the Northern District of California

particularly appropriate means of resolving claims against forest

management decisions by the U.S. Forest Service."). As the scope

of this Court's review is confined to the administrative record,

this case presents no questions of material fact that would render

it inappropriate for resolution by summary judgment.

**B.   The Administrative Procedure Act ("APA")**

The APA's general review provisions, 5 U.S.C. §§ 701, <u>et</u>

<u>seq.</u>, apply in cases asserting violations of the NFMA, ESA, and

NEPA. <u>See</u>, <u>e.g.</u>, <u>Native Ecosystems Council v. Dombeck</u>, 304 F.3d

886, 891 (9th Cir. 2002). A reviewing court must "hold unlawful

and set aside" an agency action if it is "arbitrary, capricious,

an abuse of discretion, or otherwise not in accordance with law."

5 U.S.C. § 706(2)(A); <u>Thomas Jefferson Univ. v. Shalala</u>, 512 U.S.

504, 512 (1994). An agency's determination is arbitrary or

capricious if the agency has "entirely failed to consider an

important aspect of the problem, [or] offered an explanation for

its decision that runs counter to the evidence before the agency .

. . ." <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.</u>

<u>Co.</u>, 463 U.S. 29, 43 (1983). However, "[t]he court is not

empowered to substitute its judgment for that of the agency," and

may only determine whether the agency's decision "was based on a

consideration of the relevant factors and whether there has been a

clear error of judgment." <u>Citizens to Preserve Overton Park v.</u>

<u>Volpe</u>, 401 U.S. 402, 416 (1971). A court's deference to an agency

"is especially appropriate where the challenged decision

implicates substantial agency expertise." <u>Mount Graham Red</u>

<u>Squirrel v. Espy</u>, 986 F.2d 1568, 1571 (9th Cir. 1993).

**United States District Court**
For the Northern District of California

1    **V.    DISCUSSION**

2          Plaintiffs have raised a number of claims based on

3    Defendants' alleged failures to comport with procedures and

4    standards required by the NEPA and ESA.  However, before this

5    Court reaches those claims, it must address a number of

6    preliminary hurdles identified by Defendants.  Defendants argue

7    that Plaintiffs (1) lack standing to assert their current causes

8    of action; (2) have failed to identify a cause of action that is

9    ripe for judicial review; and (3) have either waived or failed to

10   exhaust administrative remedies for a number of their arguments.

11   Defs.' MSJ at 6-14.  The Court addresses each in turn below.

12         **A.    Standing**

13         The Supreme Court has held that, to satisfy the requirements

14   for standing under Article III, a plaintiff must show:

15                    (1) it has suffered an "injury in fact" that
                      is (a) concrete and particularized and (b)
16                    actual or imminent, not conjectural or
                      hypothetical; (2) the injury is fairly
17                    traceable to the challenged action of the
                      defendant; and (3) it is likely, as opposed to
18                    merely speculative, that the injury will be
                      redressed by a favorable decision.

19

20   Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,

21   528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of

22   Wildlife, 504 U.S. 555, 560-61 (1992)).[5]

23   ────────────────

24        [5] Defendants fault Plaintiffs for failing to provide a
     detailed analysis of the standing elements in their opening brief.
25   The Court finds that the submission of declarations on behalf of
     members of each organizational plaintiff, see footnote 6, infra, is
26   sufficient to prevent dismissal of Plaintiffs' suit.  See Northwest
     Envtl. Def. Ctr. v. Bonneville Power Admin., 117 F.3d 1520, 1528
27   (9th Cir. 1997) ("Because standing was not at issue in earlier
     proceedings, we hold that petitioners in this case were entitled to

28                                  11

United States District Court
For the Northern District of California

1    Plaintiffs, as associations, have standing to bring suit on

2   behalf of their members so long as their "members would otherwise

3   have standing to sue in their own right, the interests at stake

4   are germane to the organization's purpose, and neither the claim

5   asserted nor the relief requested requires the participation of

6   individual members in the lawsuit."  Friends of the Earth, Inc. v.

7   Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 181 (2000).

8   Defendants do not contend that the interests at stake in this

9   litigation are not germane to Plaintiffs' purpose, nor do they

10  claim that the suit requires the participation of individual

11  members.  The Court finds that these two elements are met with

12  respect to each organizational Plaintiff.  The Court will

13  therefore focus on whether Plaintiffs' members have standing.

14          **1.   Injury in Fact**

15   "To satisfy the injury-in-fact requirement of the Article III

16  inquiry, 'a plaintiff asserting a procedural injury must show that

17  the procedures in question are designed to protect some threatened

18  concrete interest of his that is the ultimate basis of his

19  standing.'"  Salmon Spawning & Recovery Alliance v. Gutierrez, 545

20  F.3d 1220, 1225 (9th Cir. 2008) (quoting Citizens I, 341 F.3d

21  1002).  The plaintiff must also establish "the reasonable

22  probability of the challenged action's threat to [his or her]

23  concrete interest.'"  Citizens I, 341 F.3d at 969 (quoting Hall v.

24  Norton, 266 F.3d 969, 977 (9th Cir. 2001)).  Plaintiffs must

25  therefore adduce sufficient facts to show that (1) the Forest

26  _____

27  establish standing anytime during the briefing phase.").

28                              12

**United States District Court**
For the Northern District of California

Service violated procedural rules; (2) that the rules protect
Plaintiffs' concrete interests; and (3) that it is "reasonably
probable" that the challenged action will threaten Plaintiffs'
concrete interests.  See <u>City of Sausalito v. O'Neill</u>, 386 F.3d
1186, 1197 (9th Cir. 2004) (citing <u>Citizens I</u>, 341 F.3d at 969-
70).

    In this case, Plaintiffs are challenging the adequacy of the
Forest Service's EIS; this amounts to a claim that the Forest
Service failed to comply with NEPA's procedural requirement that
agencies provide a "detailed statement" describing the
environmental impact of the proposed action and its alternatives.
<u>See</u> 42 U.S.C. 4332(2)(C); <u>see also</u> <u>Ashley Creek Phosphate Co. v.
Norton</u>, 420 F.3d 934, 937-38 (9th Cir. 2005) (holding that alleged
injury based on inadequacy of EIS is, in essence, alleged injury
based on failure to comply with NEPA).  In addition, Plaintiffs
allege that Defendants failed to consult with the relevant
Wildlife Services before adopting the MIS Amendment.  This is
cognizable as a procedural injury, and Plaintiffs have met the
first prong for establishing injury in fact.  <u>Citizens I</u>, 341 F.3d
at 971.  Plaintiffs have also shown a concrete interest, which in
the Ninth Circuit, requires a "geographic nexus between the
individual asserting the claim and the location suffering
environmental impact."  <u>Id.</u> (quoting <u>Public Citizen v. Dep't of
Transp.</u>, 316 F.3d 1002, 1015 (9th Cir. 2003), <u>rev'd on other
grounds</u>, 541 U.S. 752 (2004) ("<u>Public Citizen I</u>")).  Plaintiffs
"need not assert that any specific injury will occur in any
specific national forest that their members visit."  <u>Id.</u>  Here,

13

United States District Court
For the Northern District of California

1   individual members of each association have submitted

2   declarations, averring that they use and enjoy the national

3   forests that will be affected by the MIS Amendment.[6]

4        The brunt of Defendants' standing arguments focus on whether

5   it is "reasonably probable" that the challenged action will

6   threaten Plaintiffs' concrete interests.  <u>See</u> Defs.' Reply at 5-7.

7   Unless distinguishable from the current case, <u>Citizens I</u>, 341 F.3d

8   961, is controlling.  In <u>Citizens I</u>, the Ninth Circuit held that

9   it was "reasonably probable" that the Forest Service's new rules

10  threatened the plaintiffs' concrete interests, where those new

11  rules relaxed substantive protections that affected development of

12  LRMPs and site specific-plans.  <u>Id.</u> at 973.  It reached this

13  holding even though the new rules effected a programmatic change,

14  which did "not result in any direct environmental effects."  <u>Id.</u>

15  The court noted that several "substantive" protections had been

16  relaxed: The new rules would "decrease[] substantive environmental

17  requirements (thus injuring [plaintiffs'] concrete interest in

18  enjoying the national forests) as compared to the 1982 Plan

19  Development Rule."  <u>Id.</u> at 972.  In particular, the panel noted

20  that the new rules had lifted general timber harvesting

21  requirements in favor of requirements set by individual forests

22  (thereby eliminating specific limits on clear cutting),

23  drastically altered the appeals process (replacing a post-decision

24

25       [6] Declarations were submitted by Justin Augustine, member and
    employee of the Center for Biological Diversity, Pls.' MSJ Ex. 1,
26  Alan Carlton, Life Member of the Sierra Club, <u>id.</u> Ex. 2, Pamela
    Flick, member of Defenders of Wildlife, <u>id.</u> Ex. 3, and Craig
27  Thomas, member and Executive Director of Sierra Forest Legacy, <u>id.</u>
    Ex. 4.

28
                                14

United States District Court
For the Northern District of California

appeal with a pre-decision "objection"), and "decreased the species viability requirement" (by stating that the Forest Service need only guarantee a "high likelihood" of supporting viability of existing species, where old rules required it to "insure" such viability).  Id.

Defendants argue that this case is distinguishable from Citizens I, because there are no "substantive" environmental protections implicated by the MIS Amendment.  See Defs.' Reply at 5-7.  Because the MIS Amendment only changes MIS monitoring requirements, and because neither the pre- nor post-amendment regime requires any substantive outcome, Defendants claim that Plaintiffs' arguments rest on "conjecture that the Amendment will result in information gaps that will lead to project decisions that overlook harms to species that, in turn, occupy parts of the National Forests that Plaintiffs 'use and enjoy.'"  Id. at 5-6.  In other words, the MIS Amendment only affects Forest Service procedure, and as such, it does not itself do anything to "threaten" the environment used by Plaintiffs.

Although the Court agrees with Defendants' characterization of the MIS Amendment as non-substantive, it disagrees that this precludes standing.  The Court does not read Citizens I, and the cases that it cites, to rest precariously on the characterization of the regulations at issue as "substantive," nor did it drive a wedge between "substantive" and "procedural" protections.[7]

---

[7] In fact, one of the rule modifications that was mentioned by the Citizens I panel is more aptly characterized as procedural rather than substantive, i.e., the change from a post-determination appeal to a pre-determination objection.  See 341 F.3d at 972.

15

United States District Court
For the Northern District of California

Citizens I did note that the rules in question offered
"substantive" protections, however the focus of the panel's
inquiry was upon the likelihood that the challenged action would
threaten or impact the forests used by the plaintiffs, and not on
how direct or foreseeable that effect would be.  See Citizens I,
341 F.3d at 975 ("The relevant inquiry for the immediacy
requirement in the procedural context is whether there is a
'reasonable probability' that the challenged procedural violation
will harm the plaintiffs' concrete interests, not how many steps
must occur before such harm occurs." (citations omitted)); Idaho
Conservation League v. Mumma, 956 F.2d 1508, 1515 (9th Cir. 1992)
("[Plaintiff's] complaint is that the faulty EIS has made possible
development that wilderness designation would have prevented.").
The panel held that the new rule relaxed certain protections, and
that this was enough to establish standing.  Citizens I, 341 F.3d
at 975.

     Although Defendants may characterize the MIS Amendment as
"merely" procedural, a procedural protection is a protection
nonetheless.  This is especially true in the context of
environmental protection, where many of the safeguards in place
are premised on the notion that the process of gathering and
analyzing information is an integral means to protecting the
environment.  NEPA is a readily available example:  "Although
[its] procedures are almost certain to affect the agency's
substantive decision, it is now well settled that NEPA itself does
not mandate particular results, but simply prescribes the
necessary process. . . .  NEPA merely prohibits uninformed --

16

rather than unwise -- agency action." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350-51 (1989).  To be sure, a procedural safeguard is less "direct" than a substantive safeguard, but the "Ninth Circuit has squarely rejected [the] distinction between direct and direct effects because ' . . . such line drawing seems inherently arbitrary.'"  California v. United Stated Dep't of Agric., 459 F. Supp. 2d 874, 886 (N.D. Cal. 2006) (quoting Citizens I, 341 F.3d at 975).  This Court therefore declines to draw a bright-line distinction between procedural and substantive protections for the purpose of determining standing.

Prior to the MIS Amendment, Courts in the Ninth Circuit have treated MIS monitoring requirements as procedural safeguards, and as prerequisites to project implementation.  See Earth Island, 442 F.3d at 1174 ("These regulations require population monitoring.").  Courts have enjoined the Forest Service from implementing projects where monitoring and analysis for affected MIS was lacking.  See, e.g., id. at 1176 ("The [Forest Service's] approval and implementation of [projects] without appropriate or sufficient population and habitat data is contrary to NFMA and governing provisions of the forest plan.").  The MIS Amendment effectively remove this procedural safeguard, by allowing future projects to proceed even in the absence of previously required MIS monitoring data.  See AR at 6175 ("Complete fulfillment of the plan-level monitoring program . . . is not a precondition to project approval . . . .").  Indeed, this is a primary impetus behind the MIS Amendment.  See id. at 6189.  This Court is bound to follow the holding in Citizens I, that "environmental plaintiffs have

17

standing to challenge not only site-specific plans, but also higher-level, programmatic rules that impose or remove requirements on site-specific plans."  341 F.3d at 975. Plaintiffs have therefore established injury in fact by demonstrating that a procedural safeguard has been removed or substantially relaxed by the MIS Amendment.[8]  It is not necessary for Plaintiffs to prove that the MIS Amendment will have any "particular environmental effects."  Id. at 972 (quoting City of Davis v. Coleman, 521 F.3d 661, 670-71 (9th Cir. 1975)).

**2.   Causation**

Because Plaintiffs have alleged a procedural injury, the causation and redressibility requirements are relaxed.  Lujan, 504 U.S. at 572 n.7.  As in Citizens I, there is no dispute about whether the procedural injury that Plaintiffs allege is fairly traceable to the acts of Defendants, "because this requirement is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant."  Id. (citing Idaho Conservation, 956 F.2d at 1518). Defendants argue that Plaintiffs cannot meet the causation requirement because actual harm will arise only from ground-disturbing activities, and "the amendment neither authorizes nor triggers any ground-disturbing activities."  AR at 6531; Defs.' Reply at 8.  However, Plaintiffs have established a procedural

---

[8] Defendants argue that the revised MIS lists will actually improve monitoring. Defs.' Reply at 7.  This is irrelevant.  The MIS Amendment still removes a significant safeguard because, even if the new monitoring scheme is improved, monitoring will no longer be a prerequisite to project implementation.  AR at 9175.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1  injury, and the Ninth Circuit has squarely rejected Defendants'

2  contention that a programmatic amendment cannot confer standing

3  simply because it does not directly cause ground-disturbing

4  activity.  <u>Citizens I</u>, 341 F.3d at 972.

5       **3.   <u>Redressability</u>**

6       "Redressability depends on whether the court has the ability

7  to remedy the alleged harm."  <u>Nuclear Info. & Res. Serv. v.</u>

8  <u>Nuclear Regulatory Comm'n</u>, 457 F.3d 941, 955 (9th Cir. 2006).

9  "Plaintiffs alleging procedural injury can often establish

10  redressibility with little difficulty, because they need to show

11  only that the relief requested -- that the agency follow the

12  correct procedures -- may influence the agency's ultimate decision

13  of whether to take or refrain from taking a certain action."

14  <u>Salmon Spawning</u>, 545 F.3d at 1226-27; <u>see also</u> <u>Hall</u>, 266 F.3d at

15  977 ("It suffices that, as NEPA contemplates, the [agency's]

16  decision could be influenced by the environmental considerations

17  that NEPA requires an agency to study.").  The Forest Service

18  could have drafted the EIS differently than it actually had.  It

19  is possible that, had the Forest Service conducted their EIS

20  discussion and analysis so as to avoid the purported NEPA

21  violations that Plaintiffs allege, or had the Forest Service

22  initiated formal consultations with the Wildlife Services after

23  finding that there was a possible impact on endangered species,

24  this could have influenced the Forest Service's decision with

25  respect to the MIS Amendment.

26       **4.   <u>The APA</u>**

27       Because NEPA creates no private cause of action, Plaintiffs

28                                      19

must also establish statutory standing under the APA.  Plaintiffs must show: "(1) that there has been final agency action adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury falls within the 'zone of interests' of the statutory provision the plaintiff claims was violated."  Churchill County, 150 F.3d at 1078 (quoting Lujan, 497 U.S. at 882-83).  Defendants do not challenge Plaintiffs' standing under the APA.  The August 25, 2008 appeal before the Appeal Deciding Officer was the final administrative determination of the Department of Agriculture.  AR at 12260.  Plaintiffs therefore meet the requirement of the first prong.  NEPA is intended to protect the environment, see Presidio Golf Club v. National Park Serv., 155 F.3d 1153, 1158 (9th Cir. 1998), and the injury that Plaintiffs allege therefore falls within the "zone of interest" of NEPA.  Plaintiffs meet the requirement of the second prong. Plaintiffs have standing under the APA.

**B.   Ripeness**

Defendants claim that the current controversy is not ripe for adjudication.  Defs.' MSJ at 9-10.  The doctrine of ripeness serves "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967).  The Court must consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial

20

United States District Court
For the Northern District of California

intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.  Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 733 (1998). Defendants claim that the Plaintiffs' cause of action rests "upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  Defs.' MSJ at 9 (quoting Texas v. United States, 523 U.S. 296, 300 (1998).  Plaintiffs compare this suit to that in Ohio Forestry Association, in which the Supreme Court held that a facial challenge to a forest plan was not ripe for judicial review, as the plan created no rights or obligations and included no site-specific projects to consider.  523 U.S. at 732-37.

Plaintiffs are not challenging the validity of the MIS Amendment itself, but rather the process that the Forest Service undertook to adopt it.  The Supreme Court in Ohio Forestry Association contrasted a facial challenge to a forest plan to procedure-based challenges under NEPA:

> [The Forest] Plan, which through standards guides future use of forests, [does not] resemble an environmental impact statement prepared pursuant to NEPA.  That is because in this respect NEPA, unlike the NFMA, simply guarantees a particular procedure, not a particular result.  Hence a person with standing who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place, for the claim can never get riper.

523 U.S. at 737 (citations omitted).  The Ninth Circuit has also applied this distinction.  In Kern v. United States Bureau of Land Management, the court held that plaintiffs alleging a NEPA

21

United States District Court
For the Northern District of California

violation -- an allegedly inadequate EIS -- were able to "show an imminence of harm to the plaintiffs and a completeness of action by the agency that the Court held were missing in <u>Ohio Forestry</u>." 284 F.3d 1062, 1070 (9th Cir. 2002).  The court explained that "[t]he rights conferred by NEPA are procedural rather than substantive, and plaintiffs allege a procedural rather than substantive injury.  If there was an injury under NEPA, it occurred when the allegedly inadequate EIS was promulgated."  <u>Id.</u> at 1071 (citations omitted).

The Court finds that, because this is a review of the administrative process used to create the MIS Amendment, judicial intervention at this stage in the MIS Amendment would not inappropriately interfere with administrative action, and there would be no benefit to waiting for further factual development. If the Forest Service has committed a procedural error, this error is reviewable based on the present record.

**C.   <u>Waiver & Exhaustion</u>**

Defendants contend that a number of Plaintiffs' arguments are not properly before the Court because Plaintiffs failed to raise them during the rule-making and administrative appeal procedures. Defs.' MSJ at 10-15.  Defendants focus on one of the Plaintiffs' NEPA arguments (referred to in this section as the "no action" argument, and described in greater detail in Part V.D.1, <u>infra</u>) and their ESA claim.  <u>Id.</u>  Defendants contend that there are two separate doctrines in play.  First, Defendants claim that Plaintiffs failed to raise or adequately describe these arguments during the notice and comment period for the MIS amendment, and

22

are therefore barred by the doctrine of waiver. Id. at 10.
Second, Defendants claim that Plaintiffs failed to raise these
issues during their administrative appeal before the Appeal
Deciding Officer, and are therefore barred by the doctrine of
issue exhaustion. Id. at 14.

The Supreme Court has clearly established that plaintiffs
"challenging an agency's compliance with NEPA, must 'structure
their participation so that it . . . alerts the agency to the
[parties'] position and contentions,' in order to allow the agency
to give the issue meaningful consideration." Dep't of Transp. v.
Public Citizen, 541 U.S. 752, 764 (2004) ("Public Citizen II")
(quoting Vermont Yankee Nuclear Power Corp. v. Nat'l Res. Def.
Council, Inc., 435 U.S. 519, 553 (1978))(brackets in Public
Citizen II).  Failure to adequately discuss a particular
consideration during the notice and comment period constitutes
forfeiture of any objection on those grounds.  Id.  The Ninth
Circuit has required plaintiffs to meet this requirement by, in
essence, giving the agency "notice" of the issues in question:  "A
party has participated in a sufficiently meaningful way when it
has alerted the agency to its position and claims." City of
Sausalito, 386 F.3d at 1208.  Plaintiffs are generally obliged to
submit their concerns and information before the comment period
for the DEIS is complete. See Havasupai Tribe v. Robertson, 943
F.2d 32, 34 (9th Cir. 1991) (plaintiff could not rely on "a letter
drafted after the final EIS issued" because plaintiff "had some
obligation to raise these issues during the comment process. Its
views were solicited.").

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Defendants contend that statutory and regulatory provisions

2  create an additional layer of requirements: Not only must

3  plaintiffs raise the issue at the notice and comment period, they

4  must also raise it during the administrative appeal.  Defendants

5  cite to 7 U.S.C. § 6912(e), which provides that "a person shall

6  exhaust all administrative appeal procedures . . . before the

7  person may bring an action in a court of competent jurisdiction

8  against" the Forest Service.  "The plaintiffs have exhausted their

9  administrative appeals if the appeal, taken as a whole, provided

10  sufficient notice to the Forest Service to afford it the

11  opportunity to rectify the violations that the plaintiffs

12  alleged." Native Ecosystems Council v. Dombeck, 304 F.3d 886, 899

13  (9th 2002).  "[C]laims raised at the administrative appeal and in

14  the federal complaint must be so similar that the district court

15  can ascertain that the agency was on notice of, and had an

16  opportunity to consider and decide, the same claims now raised in

17  federal court." Kleissler v. United States Forest Serv., 183 F.3d

18  196, 202 (3rd Cir. 1999); see also Native Ecosystems, 304 F.3d at

19  899 (quoting Kleissler).  It is not enough for a party to

20  participate in an appeal that addresses other issues -- it must

21  actually have raised the particular issue in question during the

22  administrative appeal process.  See Idaho Sporting Cong. v.

23  Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002) (finding exhaustion

24  with respect to one issue but not another).

25    The Court finds that both of the arguments at issue here were

26  before the agency during the relevant stages of its review.

27  First, the Court finds that the NEPA-based "no action" argument

28
                                    24

was sufficiently raised during both the comment period and the administrative appeal process.  Plaintiffs' comment letter to the Forest Service complained that the "no action" alternative was "poorly defined," and in particular, that it "fail[s] to describe and assess [] existing requirements."  AR at 6542, 7855.  The Court finds that Plaintiff's comments were sufficient to "alert[] the agency to its position and claims."  City of Sausalito, 386 F.3d at 1208.  Defendants concede that Plaintiffs addressed this issue in the administrative appeal.  Defs.' MSF at 12; AR at 12157 ("[T]he FEIS fails adequately to describe the 'no action' alternative and as a result fails to adequately to [sic] assess the extent to which the proposed action will modify the status quo.").  Consequently, Plaintiffs are not barred from raising this argument before this Court.

Second, the Court finds that the Forest Service has had adequate opportunity to address the underlying issue at the heart of Plaintiffs' ESA claim, both during the comment period and during the administrative appeal.  Plaintiffs correctly point out that other commentators argued that the Forest Service's BA was inadequate during the comment period.  See AR at 6518-19 (comments of Sequoia ForestKeeper).  As other district courts in the Ninth Circuit have recognized, where another commentator provides an agency with comments on a particular issue, this is sufficient to put the agency on notice and give it an opportunity to address the objection.  See, e.g., Conservation Cong. v. United States Forestry Serv., 555 F. Supp. 2d 1093, 1106-07 (E.D. Cal. 2008).  The Forest Service also argues that no party raised the issue of

25

**United States District Court**
For the Northern District of California

ESA compliance on appeal.  Defs.' Reply at 12.  The Court finds
this fact to be irrelevant, because of the nature of Plaintiffs'
ESA claims.   These claims raise identical issues to those raised
in another of Plaintiffs' claims related to NEPA, i.e., whether
the MIS Amendment caused an "effect."  Plaintiffs now take issue
with the Forest Service's BA, which concluded that the MIS
Amendment would have "no effect" on listed species.  Pls.' MSJ at
34.  The Forest Service used the same underlying reasoning to
support its "no effect" findings with respect to NEPA and the ESA.
Compare AR at 6231-34 with AR at 6267, 6512.  Plaintiffs have
objected to this underlying reasoning in every level of the
administrative process.  AR at 6543, 12264.  The Forest Service's
reasoning and responses regarding these issues were so similar
that separate treatment of these issues was unnecessary.
Plaintiffs' objection to the Forest Service's underlying reasoning
was well documented, and is now sufficient to meet the exhaustion
requirement, even though their objection was not tailored to the
ESA at the administrative appeal stage.  See Idaho Sporting, 305
F.3d at 966 ("[I]t would be unreasonable to require plaintiffs" to
"incant the magic words . . . to leave the courtroom door open.").

     The Forest Service also objects to two reports that
Plaintiffs first submitted to the Forest Service at the
administrative appeal stage.  Defs.' MSJ at 12-13.  The Court
finds that these reports were properly before the Forest Service
before it made its final determination, and were included by the
agency in its Administrative Record.  AR at 12161-222, 12223-32.
Moreover, most of the reports (especially the Britting report)

**United States District Court**
For the Northern District of California

1  simply flesh out the arguments that Plaintiff made in their

2  previous comments, rather than introduce additional scientific

3  data.  The Court will consider these studies as part of the full

4  administrative record.

5       D.   **NEPA**

6       Plaintiffs claim that the FEIS for the MIS Amendment violated

7  NEPA in several respects.  Plaintiffs claim that 1) the FEIS does

8  not adequately describe the "no action" alternative; 2) the FEIS

9  does not adequately describe the proposed action; and 3) the FEIS

10 does not disclose or analyze the environmental impacts of the MIS

11 Amendment, and instead arbitrarily concludes that it will cause no

12 ecological effects.  Pls. MSJ at 13.  The Forest Service has

13 responded to each of these arguments, and has further argued that

14 no FEIS was necessary because the MIS Amendment has no ecological

15 effects.

16      A court normally reviews the Forest Service's compliance with

17 NEPA under the "arbitrary and capricious" standard.  Cal. ex rel.

18 Lockyer v. United States Dep't of Agric., 2009 U.S. App. LEXIS

19 17440, at *24 (9th Cir. Aug. 9, 2009).  Deference is particularly

20 strong where the agency has gone through the process of creating

21 an EIS.  Judicial review of an EIS is "extremely limited."  See

22 National Parks & Conservation Ass'n v. United States Dep't of

23 Transp., 222 F.3d 677, 680 (9th Cir. 2000).  Courts must "employ a

24 rule of reason to determine whether the EIS contains a reasonably

25 thorough discussion of the significant aspects of probable

26 environmental consequences," to ensure that the agency took a

27 "hard look" at those consequences.  Kern, 284 F.3d at 1070

28

United States District Court
For the Northern District of California

1  (quotations omitted).   The court "need not agree with the agency's

2  conclusions[, but] must approve the EIS if [it is] satisfied that

3  the EIS process fostered informed decision-making and public

4  participation."   <u>National Parks & Conservation Ass'n</u>, 222 F.3d at

5  680.   However, "the less deferential standard of 'reasonableness'

6  applies to threshold agency decisions that certain activities are

7  not subject to NEPA's procedures."   <u>Northcoast Envtl. Ctr. v.</u>

8  <u>Glickman</u>, 136 F.3d 660, 667 (9th Cir. 1998).

9           **1.   Whether an EIS Was Required**

10      Although the Forest Service issued an EIS for the MIS

11  Amendment, Defendants argue that the Court need not analyze the

12  adequacy of this EIS, because the EIS was not required by law.

13  Defs.' MSJ at 17 (citing <u>Burbank Anti-Noise Group v. Goldschmidt</u>,

14  623 F.2d 115, 116 (9th Cir. 1980).   Defendants point out that,

15  after it completed its EIS, the Forest Service concluded that the

16  MIS Amendment had "no ecological impact," because it was largely

17  programmatic in nature and affected only the monitoring strategies

18  that the Forest Service used to gather data.   AR at 6321-22.

19      The Court disagrees with Defendants' argument, and finds

20  instead the EIS completed by the Forest Service was required, and

21  must therefore comport with the requirements of NEPA.   "An EIS

22  must be prepared if substantial questions are raised as to whether

23  a project . . . may cause significant degradation of some human

24  environmental factor."   <u>Blue Mountains Biodiversity Project v.</u>

25  <u>Blackwood</u>, 161 F.3d 1208, 1212 (9th Cir. 1998) (quotations

26  omitted).   As indicated by the discussion with respect to

27  standing, <u>see</u> Part V.A.1, <u>supra</u>, the MIS Amendment removed an

28                                      28

**United States District Court**
For the Northern District of California

environmental safeguard that had previously been enforced by

various courts to halt Forest Service projects.  Plaintiffs' claim

that there were "substantial questions" as to the MIS Amendment's

ecological effects is therefore well founded.  In addition, Courts

in the Ninth Circuit have previously rejected attempts by the

Forest Services and Department of Agriculture to evade EIS

requirements by claiming that a regulatory change is merely

"programmatic," and causes no ground-level disturbances.  <u>See</u>

<u>Citizens II</u>, 481 F. Supp. at 1085-86 (collecting cases).  The

Forest Service is therefore required to issue an EIS that includes

a reasoned discussion of any and all programmatic changes, if at

the outset the changes raise "substantial questions whether a

project may have a significant effect."  <u>See</u> <u>Idaho Sporting</u>

<u>Congress v. Thomas</u>, 137 F.3d 1146, 1149-50 (9th Cir 1998)

overruled in part on other grounds by <u>Lands Council v. McNair</u>, 537

F.3d 981 (9th Cir. 2008) (en banc).  Even if an EIS successfully

puts the "substantial questions" to rest, this does not

retroactively eliminate NEPA's demand for reasoned discussion and

public participation to address those questions.  The Forest

Service was therefore required to prepare an EIS, and this Court

must examine the EIS to ensure that it is adequate.

> **2.** **<u>Whether the FEIS's Description of the "No Action"
> Alternative Was Adequate</u>**

Plaintiffs claim that the FEIS fails to provide an adequate

description of the so-called "no action" alternative; i.e., the

pre-amendment MIS monitoring scheme that was replaced.  Pls.' MSJ

at 16-19.  Plaintiffs contend that a detailed description of the

"no action" alternative is necessary to establish a "baseline" for comparison for the other alternatives.  Id. at 16 (citing Half Moon Bay Fishermans' Mktg. Ass'n v. Carlucci, 857 F.2d 505, 510 (9th Cir. 1988)).  In particular, Plaintiffs fault Defendants for: (1) failing to discuss the adaptive management components found in each of the original forest plans; and (2) failing to describe agency activities that had been enjoined because of the pre-amendment monitoring requirements.  Id. at 16-19.

The FEIS provided a description of the pre-amendment MIS monitoring regime, which it refers to as "Alternative 2."  AR at 6236-37.  The FEIS listed each species under the pre-amendment system, and noted the type of monitoring used for every species (habitat monitoring or population monitoring).  Id. at 6213-15.  It described generally the quality of information that had been gathered from pre-amendment monitoring for each species, and critiqued each species according to the MIS selection criteria that the Forest Service established for the MIS Amendment.  Id. at 6273-327.  This species-by-species analysis adequately explains the Forest Service's conclusion that "[t]he No Action Alternative . . . includes MIS that ineffectively serve the role to monitor the outcome of plan implementation on the National Forests in the Sierra Nevada."  Id. at 6237.

The FEIS certainly could have gone into more detail regarding the specific monitoring programs that each individual forest had established for each MIS.  However, as the Ninth Circuit "has recognized on a number of occasions, merely because a 'no action' proposal is given a brief discussion does not suggest that it has

30

been insufficiently addressed." <u>Friends of Southeast's Future v.</u>

<u>Morrison</u>, 153 F.3d 1059, 1065 (9th Cir. 1998) (quotations

omitted).  This is particularly true where, as here, the agency's

action was prompted by dissatisfaction with the "no action" status

quo.  AR at 6190; <u>c.f.</u> <u>Oregon Natural Res. Council v. Lynq</u>, 882

F.2d 1417, 1423 n.5 (1989), amended by 899 F.2d 1565 (9th Cir.

1990) ("The fact that the description of the no-action alternative

is shorter . . . may only reveal that the forest service believed

that the concept of a no-action plan was self-evident while the

specific timber sale plans needed explanation.").  The description

in the FEIS was sufficient to show that the "no action"

alternative was considered and found to be wanting.  The Forest

Service provided a satisfactory explanation for its conclusion

that the "no action" alternative was inadequate, and little would

be gained by requiring the Forest Service to exhaustively describe

the monitoring strategies or directives that had been developed by

each park for the sixty different species.[9]

        This Court also concludes that the FEIS was not flawed by its

failure to specifically describe the various projects that had

been enjoined under the pre-amendment regime.  The FEIS certainly

did not hide the fact that pre-amendment monitoring obligations

had served as a bar for Forest Service projects, or that it

_____

        [9] <u>Oregon Natural Res. Council Action v. United States Forest</u>
<u>Serv.</u>, 445 F. Supp. 2d 1211 (D. Or. 2006), is not to the contrary.
In that case, the court criticized the Forest Service for failing
to describe and analyze the impact of "survey and manage duties"
that governed the proposed action.  <u>Id.</u> at 1223-24.  Here,
Plaintiff are asking the Forest Service to more fully describe
monitoring requirements for species that, they contend, will no
longer be in effect.  Pls.' Reply at 15.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

intended for the MIS Amendment to remove this bar.  <u>See</u> AR at

6189.  Plaintiffs argue that the FEIS should have discussed

certain projects in greater detail because they would be given the

"green light" by the MIS amendment.  Pls.' MSJ at 19-12.  However,

Plaintiffs have not identified a single project that would have

been put on hold because of the Forest Service's MIS monitoring

obligations, and which the Forest Service is still planning to go

forward with now that the MIS Amendment had been issued.  In other

words, Plaintiffs do not firmly establish that there is a planned

project for which the MIS amendment will actually make a

difference.  Certainly there are planned projects that will go

forward with different procedures than they otherwise would have,[10]

but Plaintiffs have not pointed to a project that is so dependant

upon the MIS Amendment that its impacts should have been

considered as part of the "no action" alternative.

### 3. <u>Whether the FEIS's Description of the Proposed Action Was Adequate</u>

Plaintiffs next contend that the FEIS was inadequate because

it failed to describe or develop certain important details of the

MIS Amendment.  They claim that, for this reason, the MIS is

"incomplete or misleading."  Pls.' MSJ at 19.  As discussed in

Part III, <u>supra</u>, prior to passing the MIS Amendment, individual

forests created particular management objectives and monitoring

protocols for each MIS.  According to Plaintiffs, the MIS

---

[10] The Record of Decision does list several projects that will
be subject to alternative monitoring requirements during the
transition period.  AR at 6174; <u>see also</u> Craig Thomas Decl. ¶ 8.

1  Amendment does not clearly indicate management objectives for new

2  species, or describe how monitoring will occur for new MIS

3  (e.g., the Pacific tree frog, northern flying squirrel, and fox

4  sparrow).  Id. at 19-22; AR at 6162.  Instead, the Forest Service

5  states that it will create a "monitoring implementation package"

6  to address these details in the future.  AR at 6173, 6420.

7      To support their argument that the FEIS does not adequately

8  describe the new monitoring scheme, Plaintiffs list several

9  substantive requirements established by the NFMA and implementing

10 regulations with respect to individual forest plans.  See Pls.'

11 MSJ at 20 (citing 16 U.S.C. § 1604(f)(1); 1982 Regs.

12 §§ 219.12(k)(4), 219.19(a)).  They claim that these will

13 ultimately require the Forest Service to provide more detail than

14 it did in its FEIS.  However, these requirements do not apply to

15 the substance of the MIS Amendment, as the regulations only

16 require these details to be provided in a forest plan or a

17 "significant amendment" to a forest plan.  AR at 6169, 6244-45;

18 see also 1982 Regs. §§ 219.10(f), 219.12(a) (permitting the Forest

19 Supervisor to determine whether change is "significant," and

20 setting this as threshold for application of substantive

21 requirements).  The Forest Supervisor has concluded that the MIS

22 Amendment does not qualify as a "significant" amendment to a

23 forest plan.  AR at 6169.  While one could certainly question this

24 characterization, the Court must defer to the agency's application

25 of its own regulations unless the agency is clearly unreasonable.

26 See League of Wilderness Defenders v. Forsgren, 309 F.3d 1181,

27 1183 (9th Cir. 2002) ("An agency's interpretation of its own

28

33

**United States District Court**
For the Northern District of California

1    regulations is entitled to deference unless it is plainly

2    erroneous or inconsistent with the regulation . . . .").

3    Moreover, Plaintiffs do not challenge this characterization.

4    Plaintiffs are not challenging the adequacy of the MIS Amendment

5    under the NFMA, but are instead challenging the adequacy of the

6    FEIS's description of the MIS Amendment.  They contend that the

7    Forest Service's failure to flesh out the monitoring program in

8    the FEIS frustrated the purpose of NEPA by hindering public

9    participation and the decisionmaking process.  Pls.' Reply at 17-

10   18.  They refer to several comments from national forests and

11   other agencies that urge the Forest Service to provide further

12   details regarding the MIS Amendment's monitoring scheme.  Pls.'

13   MSJ at 22 (citing AR at 6416-17, 6429, 6461, 6528).

14        This Court is troubled by the possibility that the lack of

15   specificity in the MIS Amendment may have hindered the public

16   discussion.  However, Plaintiffs make no case that the rules

17   governing the MIS Amendment, such as the NFMA, actually require

18   more detail than the MIS Amendment provided.  If this Court were

19   to find that NEPA's hard-look requirement demands that the MIS

20   Amendment itself be more detailed, it would be tantamount to

21   reading a substantive requirement into NEPA.  Plaintiffs' argument

22   is therefore an impermissible attempt to bootstrap NFMA

23   requirements into a NEPA claim.  C.f. Okanogan Highlands Alliance

24   v. Williams, 236 F.3d 468, 473 (9th Cir. 2000) ("NEPA does not

25   contain, however, a substantive requirement that a complete

26   mitigation plan be actually formulated and adopted.  The

27   requirement would be inconsistent with NEPA's reliance on

28                                    34

procedural mechanisms." (quotation omitted)); Inland Empire Pub.

Lands Council v. United States Forest Serv., 88 F.3d 754, 758 (9th

Cir. 1996) ("NEPA's goal is satisfied once this information is

properly disclosed; thus, NEPA exists to ensure a process, not to

ensure any result.").

Plaintiffs cite Oregon Natural Desert Association v. Bureau

of Land Management, 531 F.3d 1114, 1130 (9th Cir. 2008) for the

proposition that "considerations made relevant by substantive

statutes driving the proposed action must be addressed in NEPA

analysis."  Pls.' MSJ at 21 n.14.  However, this case does not

read NEPA to require an agency to change the substance of a

program, or to flesh it out in greater detail than that required

by the regulations that control the development of the program.

This case instead only required an agency to consider "wilderness

values" in its EIS, because a statute setting the agency's

objectives required the agency to do so.  531 F.3d at 1132-33.

Here, Plaintiffs do not contend that the Forest Service failed to

properly consider a type of impact; rather, they contend that the

MIS Amendment should have had more substance than it actually has.

This would require the MIS Amendment to include a level of

substantive detail that is not required by the NFMA or related

regulations.  NEPA does not authorize the Court to require this of

the Forest Service.

### 4. Whether the Forest Service's Finding of "No Ecological Effect" Was Arbitrary

Plaintiffs next contend that the Forest Service arbitrarily

concluded that the MIS Amendment would have no ecological effects.

United States District Court

For the Northern District of California

United States District Court
For the Northern District of California

1   Pls.' MSJ at 22.   In the section of the FEIS entitled "Affected

2   Environment and Environmental Consequences," the Forest Service

3   concludes that "the Proposed Action and alternatives have no

4   ecological effects.   This is because the alternatives solely

5   involve a procedure whereby particular species are monitored, and

6   data are gleaned and analyzed based on the monitoring results."

7   AR at 6231.   Instead of identifying and comparing environmental

8   impacts, the chapter sets out the Forest Service's reasoning for

9   its conclusion of "no ecological effects."   Id. at 6231-46.

10      "NEPA requires that a federal agency consider every

11  significant aspect of the environmental impact of a proposed

12  action and inform the public that it has indeed considered

13  environmental concerns in its decisionmaking process."   Pit River

14  Tribe v. United States Forest Serv., 469 F.3d 768, 781 (9th Cir.

15  2006) (quoting Earth Island, 442 F.3d at 1153-54).   An EIS must

16  therefore assess not only every direct effect of the proposed

17  action, but also indirect effects, "which are caused by the action

18  and are later in time or farther removed in distance, but are

19  still reasonably foreseeable."   40 C.F.R. § 1508.8(b).

20      The MIS Amendment overhauls the Forest Service's monitoring

21  protocol.   As such, its effect is to change the information that

22  the Forest Service has at its disposal when it makes future

23  management decisions.   Defendants claim that the new list will

24  provide better and more useful information than previous lists,

25  because it is universal across the region's forests, and because

26  it is focused on ecosystems of interest to the Forest Service's

27  land management activities.   See AR at 6160-61.   Plaintiffs insist

28
                                    36

United States District Court
For the Northern District of California

that the new list is full of holes, and that certain management

effects will therefore go undetected.  Pls.' MSJ at 25.  Even if

the MIS Amendment gives the Forest Service better information when

MIS monitoring is fully performed, one effect of the MIS Amendment

is to remove the procedural requirement that MIS data be complete

before particular projects go forward.  AR at 6175.  All of this

means that as a result of the MIS Amendment, the Forest Service

will be making future program decisions with a different, and

potentially less complete, mix of information.  The Court has

little doubt that the MIS Amendment will have some kind of

ecological effect, in the sense that the different mix of

information available to the Forest Service will, at some point in

the future, prompt different management decisions.  The question

is whether it would be possible or practical to identify and

discuss these effects in the FEIS, or whether the Forest Service

had sufficient justification to conclude that there would be no

foreseeable ecological effect.

The FEIS offers several pages of discussion to explain its

"no effect" conclusion.  AR at 6231-46.  Several of these reasons

are baseless on their face.  The FEIS maintains that "[n]one of

the alternatives proposes, constrains, or requires particular land

management activities."  Id. at 6231.  In other words, the Forest

Service still maintains that a programmatic change that does not

authorize any particular ground-disturbing activities can have no

ecological effect.  As this Court addressed in its discussion

regarding standing, the Citizens line of cases demonstrates that

courts in the Ninth Circuit have rejected this reasoning in

United States District Court
For the Northern District of California

1   various contexts.  See Citizens I 341 F.3d at 961 (rejecting

2   argument when used to challenge plaintiffs' standing); Citizens

3   II, 481 F. Supp. at 1085-86 (rejecting argument when used to

4   justify nonperformance of EIS); Citizens for Better Forestry v.

5   USDA, No. 08-1927, 2009 U.S. Dist. LEXIS 55510, *34-36 (N.D. Cal.

6   June 30, 2009) ("Citizens III") (rejecting argument when used to

7   avoid discussion of impacts within EIS).  In addition, this Court

8   does not accept the Forest Service's contention that the MIS

9   Amendment has no foreseeable ecological effects merely because it

10  changes no "substantive" protections, or because there is no

11  change in large-scale management direction.  AR at 6232.  There

12  are possible situations where procedural changes, or actions that

13  cause no change to management direction, could have foreseeable

14  ecological effects, and the Forest Service cites no rule that

15  would exempt these types of changes from NEPA's requirements.

16      In spite the fact that the EIS contains several baseless

17  arguments, it provides another reason that is more compelling.

18  The MIS Amendment will only affect the environment by changing the

19  mix of information available to the Forest Service in the future -

20  - information that is not now and may never be available -- and

21  this raises certain foreseeability difficulties which defeats

22  Plaintiffs' claim.  Any on-the-ground ecological impact that is

23  "caused" by the MIS Amendment will presumably come about when the

24  Forest Service adopts a policy that it would not have otherwise

25  adopted, because it would have been dissuaded by information

26  gathered according to its pre-amendment monitoring practices.

27  Without that monitoring, and with a different "mix" of

28                          38

information, how will its policies differ?  And what will the impact of these differences be?  The Forest Service reasonably claims that such impacts are, by their nature, unforeseeable:

> While changing a monitoring program for a particular species could hypothetically have some indirect effect on a species management strategy over the long term, it would be impossible at this point to ascertain what that effect might be, when the effect would take place, what the geographic extent of the effect might be, and whether the effect would actually provide any substantive changes to the way a species is protected.

AR at 6232.

As the Forest Service stated in its FEIS:

> Even if a hypothetical chain of causation could be constructed to connect the current forest plan amendment with indirect harm to species deselected as MIS, that chain has far too many links to allow for a meaningful analysis of the ultimate effects to those species.  The Forest Service is not aware of any reliable methodology to engage in such a speculative analysis, and the commenter has not suggested any.  The most that can be said is that some indirect effects of an unknown magnitude are possible; this possibility is disclosed in the EIS.

Id. at 6532.

This is not a typical case in which plaintiffs are asking an agency to consider effects that will occur if a concrete risk is realized.  C.f. San Louis Obispo Mothers fo Peace v. Nuclear Regulatory Commission, 449 F.3d 1016, 1029 (9th Cir. 2006) (requiring NRC to analyze likely impact from a terrorist attack). At most, the "risk" posed by the MIS Amendment is that the Forest Service will not have information that alerts it to the effects of future management policies and activities.  At this point in time, it is impossible to know what this hypothetical information may be, or which future policies or activities it will relate to.

1   Plaintiffs attempt to identify a number of foreseeable risks posed

2   by the MIS Amendment.  These are discussed below.

3          **i.  <u>Whether Lack of Monitoring Creates a</u>**
           **<u>Foreseeable Risk</u>**

4

5          Plaintiffs argue that the MIS Amendment will have the

6   foreseeable effect of weakening the monitoring scheme that was

7   vital to the Forest Service's "adaptive management" strategy.

8   Pls.' MSJ at 25.  Plaintiffs suggest that the monitoring "holes"

9   created by the MIS Amendment will make the Forest Service

10  insensitive to particular species and habitat harms, and

11  Plaintiffs offer particular examples of species and habitats that

12  may be affected by the MIS Amendment.  <u>Id.</u>  For instance, the

13  Pacific fisher was previously listed as an MIS by several

14  individual forests, but is no longer an MIS after the amendment.

15  <u>Id.</u> at 25-26; AR at 6309-10.  The FEIS found that the Pacific

16  fisher did not meet the proposed MIS criteria for the MIS

17  Amendment, because its limited distribution makes it "unlikely to

18  provide useful information to inform forest service management at

19  the Sierra Nevada scale."  AR at 6310.  In addition, the Forest

20  Service selected several other species (the California spotted

21  owl, Northern flying squirrel, and American Martin) that will

22  allow it to monitor the same habitat.  <u>Id.</u> at 6365.  The Forest

23  Service also notes that the Pacific fisher is designated as a

24  Forest Sensitive Species ("FSS"), and consequently, it will still

25  be monitored and assessed, including in BAs prepared prior to

26  site-specific projects.  <u>Id.</u> at 6193-94, 6232, 6310, 6414.  Given

27  the existence of other monitoring programs designed to detect the

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    impact of management decisions on the Pacific fisher and its

2    habitat, the Court agrees that the Forest Service cannot

3    reasonably predict the nature and extent of the MIS Amendment's

4    impact on this species.

5         Plaintiffs point out that some species will not be monitored

6    at all subsequent to the MIS Amendment.  During the administrative

7    appeal, Plaintiffs' experts compiled a list of eleven species that

8    are no longer MIS, and are not otherwise addressed as threatened,

9    endangered, or sensitive species, such as the pileated woodpecker.

10   AR at 12167-68.  These had previously been identified as MIS

11   "because their population changes . . . [were] believed to

12   indicate the effects of management activities."  See 36 C.F.R. §

13   219.19(a)(1).  However, the record reflects the Forest Service's

14   determination that monitoring these species was inefficient (or

15   redundant, or a poor indicator of the effect of management

16   activities), as well as its conclusion that the impacts of future

17   management activities will still be adequately monitored by the

18   MIS listed within the amendment.[11]  See AR at 6366.  The Forest

19   Service is owed great deference with regard to this conclusion,

20   and the Court is not satisfied that a failure to monitor the

21   pileated woodpecker or other species will necessarily result in a

22

23        [11] Plaintiffs attempt to contest this point.  For example, they
     take issue with the MIS Amendment's selection of the hairy
24   woodpecker as an MIS, and its delisting of the pileated woodpecker
     as an MIS.  They claim that the pileated woodpecker inhabits large
25   snags, while the hairy woodpecker inhabits other types of snags.
     Pls.' MSJ at 28.  However, whether the hairy woodpecker is an
26   adequate representative for the snag ecosystem is a question of
     expertise that requires deference to the agency on the part of the
27   courts.  This argument does not satisfy the Court that the MIS
     Amendment will result in a foreseeable ecological effect.

28

1  foreseeable effect, requiring more discussion in the FEIS than

2  that already provided by the Forest Service.

3      The harms that Plaintiffs cite, caused by future projects

4  that may or may not have to be altered in response to certain

5  monitoring data, are simply too hypothetical and conjectural to be

6  described in detail by the FEIS.  At best, Plaintiffs can only

7  argue that the delisted species will be affected in some

8  unforeseeable way.  This Court finds that it was sufficient for

9  the Forest Service to clearly indicate the species that would no

10 longer be designated as an MIS, and explain why, without further

11 exploring the hypothetical impact that delisting may have on the

12 species.  AR at 6309-10.

13          **ii.  Whether the MIS Amendment Will Foreseeably
               Affect the Environment by Removing Substantive**
14             **Protections**

15     Plaintiffs attempt to bolster their claim that the MIS

16 Amendment will have foreseeable effects by claiming that it in

17 fact removes "substantive" measures that protected listed species.

18 Pls.' MSJ at 29-30.  However, Plaintiffs do not point to any

19 "substantive" requirement.  Rather, they cite various provisions

20 in forest plans that require the Forest Service to take

21 "management action" when monitoring data shows that MIS have

22 experienced rapid population or habitat changes.  <u>Id.</u>; <u>see</u> <u>also</u> AR

23 at 12177 (setting twenty-five percent change in bear population,

24 over a five-year period, as trigger in Eldorado National Forest).

25 These triggers were apparently pre-determined thresholds that were

26 established to notify the Forest Service that the effects of

27 management activities had reached a "significant" level, which

28

United States District Court
For the Northern District of California

warranted some kind of mitigated activity.  None of the triggers identified by the Plaintiffs are attached to any particular requirement or directive.  In addition, although the triggers themselves are species-specific, the pre-amendment monitoring scheme clearly indicated that the effects that they were intended to signify were broader in scope.  See, e.g., id. at 2668 ("[M]anagement of [MIS] to maintain viable population levels is intended to provide for viable populations of the remaining species in the group they represent.").  Whatever "substantive" protection was provided by the open-ended directives in the individual forest plans still exists to some extent, since the Forest Service will still be cognizant of the effects that its management activities will have as it monitors the new MIS.[12] While the new MIS may be better or worse at protecting MIS and the species that they represent, Plaintiffs have failed to identify any reasonably foreseeable environmental effect that the Forest Service has overlooked.

### iii.  Whether the Effects of Future Projects Are Effects of the MIS Amendment

Plaintiffs also argue that the MIS Amendment will give the "green light" to particular projects that will have concrete environmental impacts, and faults the FEIS for its failure to

---

[12] This is not true for species that were delisted because the Forest Service concluded that management activities did not significantly affect those habitats (e.g., caves), since no replacement MIS was selected for these species and their habitat will not be monitored under the new MIS program.  AR at 6326. Plaintiffs have not challenged the Forest Service's finding that such habitats are not significantly affected by management activities.

United States District Court
For the Northern District of California

describe these projects in detail.  Pls.' MSJ at 24.  However, as this Court previously noted, Plaintiffs have not demonstrated that the Forest Service is planning to go forward with any particular project that would be halted but for the MIS Amendment.  Rather than give any particular project a "green light," it would be more accurate to say that the MIS Amendment changes a procedure for bringing these projects about, or that it changes the amount and completeness of information that will be available to the Forest Service.  The MIS Amendment therefore "affects" these projects only in unforeseeable ways.  It does not "cause" these projects or any of their particular environmental effects.  As the pre-amendment monitoring scheme only required monitoring to take place, it presumes too much to argue that these previous obligations would have turned up information that would have inclined the Forest Service to significantly alter or modify a particular project.  This Court finds that it would therefore go too far to require the Forest Service to explain in detail every project modified by the MIS Amendment.[13]

The Court finds that the FEIS did not arbitrarily conclude that the MIS Amendment would cause no foreseeable environmental

---

[13] Implicit in Plaintiffs' argument is the presumption that the Forest Service would have failed to properly monitor pre-amendment MIS absent the amendment, and Plaintiffs and other environmental groups would have been able to enjoin numerous Forest Service projects.  However, even given the Forest Service's past monitoring failures, this Court will not presume that the Forest Service would have necessarily failed to comply with MIS monitoring requirements for future projects.  See Sierra Club v. Penfold, 857 F.2d 1307, 1319 (9th Cir. 1988) ("It would be a mistake for us to assume that because an EA was inadequate in the past, BLM will not comply with NEPA in the future.").

United States District Court
For the Northern District of California

consequences.   In reaching this conclusion, the Court recognizes
the possible tension between its finding with respect to the
adequacy of the FEIS, and its earlier conclusions with respect to
standing and the threshold question of whether an EIS was
required.   Each of these stages involve different inquiries.   At
the stage of standing, the pertinent question was whether
Plaintiffs had established a harm to the environment, by way of
reduced environmental protections.   This did not require
Plaintiffs to identify a particular harm to the environment.   See
Citizens I, 341 F.3d at 972, 975.   For the threshold inquiry of
whether an EIS is necessary, Plaintiffs had to show that
"substantial questions" exist as to the effects of a particular
agency action.   See Blue Mountains Biodiversity Project, 161 F.3d
at 1212.   The Plaintiffs have met their initial burdens by showing
that the MIS Amendment will cause "some kind" of effect on the
environment at some point in the future, and that it removes an
important procedural safeguard.   But because of the unique
informational nature of the MIS Amendment, Plaintiffs have failed
to show that any of these future effects are foreseeable.   The
FEIS does note the existence and nature of hypothetical and
unknowable future threats, and explains the difficulty in
addressing them.   AR at 6232, 6532.   The Forest Service may not
"shirk [its] responsibilities under NEPA by labeling any and all
discussion of future environmental effects as crystal ball
inquiries."   Selkirk Conservation Alliance v. Forsgren, 336 F.3d
944, 962 (9th Cir. 2003).   However, the Court is satisfied that,
in this particular case, asking the Forest Service to describe in

45

1  detail the hypothetical impacts of future monitoring, or of

2  projects that might go forward in the absence of monitoring, would

3  be akin to asking the Forest Service to perform a "crystal ball

4  inquiry."

5      **E.    Whether the Forest Service Violated the ESA**

6          Section 7(a)(2) of the ESA requires each federal agency to

7  "insure that any action, authorized, funded, or carried out by

8  [the] agency . . . is not likely to jeopardize the continued

9  existence of any endangered species or threatened species or

10  result in the destruction or adverse modification of habitat of

11  such species. . . ."  16 U.S.C. § 1536(a)(2).  To this end,

12  Section 7(b) requires action agencies to consult with the

13  appropriate Wildlife Service if it finds that a federal action

14  "may affect" a listed species or critical habitat.  Id. § 1536(b);

15  50 C.F.R. § 402.14(a).  If the action agency determines that its

16  action "may affect" critical species or habitat, then formal

17  consultation is mandated.  Nat'l Res. Def. Counsel v. Houston, 146

18  F.3d 1118, 1126 (9th Cir. 1998).  Plaintiffs contend that the

19  Forest Service impermissibly concluded in its BA that endangered

20  species would not be affected by the MIS Amendment, and therefore

21  violated the ESA by failing to formally consult with the

22  appropriate services.[14]

23

24          [14] Although the Forest Service did confer with the appropriate
   wildlife agencies informally, it apparently did not invoke the
25  informal consultation procedures set out in 50 C.F.R. § 402.13(a).
   See Order Granting Federal Defendants' Motion to Dismiss, Docket
26  No. 25, at 11-12.  By its Motion, Defendants do not argue that the
   informal consultation that the Forest Service undertook satisfies
27  the statutory or regulatory requirements of the ESA.

28
                                    46

United States District Court
For the Northern District of California

1    The Forest Service prepared a BA that concluded that the MIS

2    Amendment would have no effect on endangered species.  AR at 6267.

3    In doing so, it primarily cited the incorrect rationale already

4    rejected by this and other courts, that the MIS Amendment

5    represented a "programmatic" change that caused no ground-level

6    disturbances.  Id.; Part V.D.4, supra.  However, the Forest

7    Service permissibly released the BA together with the FEIS.  AR at

8    6257.  As this Court has already discussed, see Part V.D.4, supra,

9    the FEIS justifiably concluded that the MIS Amendment would create

10   no foreseeable environmental effects.  The implementing

11   regulations for the ESA define "effect" to require a degree of

12   certainty that is similar to the foreseeability limitation in the

13   implementing regulation for NEPA.  Compare 50 C.F.R. § 402.02

14   ("Indirect effects are those that are caused by the proposed

15   action and are later in time, but still are reasonably certain to

16   occur.") with 40 C.F.R. § 1508.8(b) ("Indirect effects, which are

17   caused by the action and are later in time or farther removed in

18   distance, but are still reasonably foreseeable.").  The Ninth

19   Circuit has ruled that the standard for determining the likely

20   effects of agency action under NEPA and the ESA are the same.

21   Defenders of Wildlife v. United States Envtl. Prot. Agency, 420

22   F.3d 946, 962-63 (9th Cir. 2005) reversed on other grounds by sub

23   nom. Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551

24   U.S. 644 (2007).  The Court therefore finds that, although the BA

25   does include a legally invalid argument, the document as a whole

26   justifies the Forest Service's conclusion that the MIS would have

27   no effect on listed species, and the Forest Service was therefore

28

1    not required to consult with the Wildlife Services.

2

3    **VI.    CONCLUSION**

4         This Court finds that the Forest Service was required to

5    issue an Environmental Impact Statement to address questions

6    raised by the MIS Amendment.   Nevertheless, the Environmental

7    Impact Statement reasonably concluded that the MIS Amendment would

8    have no foreseeable ecological impacts, because of the unique

9    nature of the MIS Amendment, which affected only the gathering and

10   analysis of information by the Forest Service.   Because of this

11   unique nature, it would be unreasonable for this Court to require

12   the Forest Service to guess at the future impacts that may result

13   from the MIS Amendment.   This Court therefore GRANTS Defendants'

14   Motion and DENIES Plaintiffs' Motion.

15

16        IT IS SO ORDERED.

17

18        Dated: August 27, 2009

19                                    _____

20                                    UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28
                                      48

**United States District Court**
For the Northern District of California